

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

ENTERED
03/11/2016

IN RE: §
LAURA NELLIE TAVARES § CASE NO: 10-10739
    Debtor §
§ CHAPTER  13

**MEMORANDUM OPINION**
**STRIKING TRUSTEE'S NOTICE OF FINAL CURE PAYMENT**
**AND MOTION TO DEEM MORTGAGE CURRENT**
*[Resolving ECF No. 111]*

### I. Introduction

Confronting this Court is a daunting compendium of post-petition moving parts. The

debtor's plan, to which the creditor at bar has not objected, provisioned for the *pro rata* treatment

of the creditor's mortgage debt. Upon completion of the plan payments, the chapter 13 trustee

issued a 3002.1(f) notice, wherein she declared that the debtor's mortgage had been cured and

paid in full. The trustee thus requested that this Court declare that the creditor's $10,659.64 claim

on Lot 27 has been paid in full, all escrow deficiencies have been cured, and all fees and charges

imposed by the creditor have been satisfied. The creditor protests on the basis that a 3002.1(f)

notice is improper, and thus should have no effect. In further complication of this matter, the

creditor's accounting of the balance due on the debt differs from the trustee's calculation,

purportedly because the creditor had attributed payments during the life of the plan to interest

and ad valorem taxes it had made on behalf of the debtor  before subtracting the principal of the

debt, whereas the trustee had done no such thing. This Court will now carefully unwind this

Gordian Knot.[1]

## II.  Findings of Fact

This Court makes the following Findings of Fact and Conclusions of Law pursuant to Federal Rules of Bankruptcy Procedure 7052, which incorporates Fed. R. Civ. P. 52.  To the extent that any Finding of Fact constitutes a Conclusion of Law, it is adopted as such.  To the extent that any Conclusion of Law constitutes a Finding of Fact, it is adopted as such.

On October 29, 2010, Laura Nellie Tavares ("***Debtor***") filed her initial voluntary petition for chapter 13 bankruptcy pursuant to title 11 of the United States Code (the "***Bankruptcy Code***" or "***Code***"),[2] thereby initiating Case No. 10-10739.  [ECF No. 1].  Simultaneous with the petition, Debtor filed her chapter 13 plan ("***Plan***").  [ECF No. 2].

In her initial schedules, Debtor claimed two parcels of real property – Lots 26 and 27, both on Block 4 – in the La Brecha subdivision in Cameron County, Texas.  [ECF No. 1, at 6.]. Debtor claimed the Texas Homestead Exemption, pursuant to Tex. Const. art. 16 §§ 50-51 and Tex. Prop. Code. §§ 41.001-.002, for the two Lots.  *Id.* at 12.  In regards to these two lots, Debtor listed Mesquite Bean Assets (f/k/a SRC Management) ("***Mesquite Bean***") as holding secured claims based on a mortgage allegedly paid off in a prior bankruptcy (the "***Note***"), albeit the amount of the claim on Lot 26 is disputed.  *Id.* at 15-16; [Claim #5 at 2].

On February 11, 2011, Mesquite Bean filed its Proof of Claim for Lot 27 in the amount of $10,659.64, which included a stated arrearage of $3,277.47.  [Claim #5].  Moreover, the Proof of Claim indicated that the Note matured within the life of the chapter 13 plan notwithstanding the fact that the underlying Note itself did not contain a stated maturity date.  Instead, the Note,

---

[1] "A matter of extreme difficulty." *Oxford English Dictionary* (online ed.)
[2] Any reference to the "***Code***" or "***Bankruptcy Code***" is a reference to the United States Bankruptcy Code, 11 U.S.C., or any section (i.e. §) thereof refers to the corresponding section in 11 U.S.C.

in the original principal amount of $15,400, simply stated that principal and interest of $194.85 was payable on the 22nd day of each calendar month, beginning on December 22, 2000 and continuing thereafter until the principal and interest having been fully paid. Creditor Ex. 1 at 15. Moreover, the Note provisioned for an interest rate on the principal to accrue at 13%. *Id.* Also, each payment was to be credited first to escrow fees, then late fees, then service fees, then accrued interest, and finally to reduction of principal. *Id.* Mesquite Bean was to collect $30 for ad valorem tax escrow monthly. *Id.* at 2.

On April 13, 2011, Debtor filed an Objection to Mesquite Bean's Proof of Claim #5 ("***Objection***"). [ECF No. 26]. In the Objection, Debtor alleges that in her prior chapter 13 bankruptcy case filed on October 2, 2004, Case No. 04-70916-B-13, Mesquite Bean filed its Proof of Claim #2 in the amount of $17,453.00 which was paid through the chapter 13 plan as a conduit mortgage pursuant to 11 U.S.C. § 1322(b)(5). *Id.* at ¶ 4. Additionally, a second Proof of Claim #6 by Mesquite Bean in the amount of $12,323.35 pertaining to Lot 26 was paid in full as a pro-rata claim under that prior plan. *Id.* Additionally, Debtor alleged that on November 20, 2009, and Order from this Court was entered declaring the mortgage current. *Id.* at ¶ 5; *see also* [Case No. 04-70916, ECF # 59]. Finally, Debtor pointed to the fact that an Order of Discharge was entered on December 21, 2009. [Case No. 04-70916, ECF #63]. Debtor then alleges that in February 2010, she received two separate letters from Mesquite Bean. [Case No. 10-10739, ECF No. 26 at ¶ 7]. The first of the two letters was a default letter regarding delinquent payments due for Lot 27, for the months of October 2009 through January 2010, which amounted to $606.67. *Id.* The Debtor stated that she cured those delinquent payments. *Id.* The second letter was also a delinquency notice, but related to Lot 26 for the months of November 2007 through February

2010 – at which time Debtor states her prior bankruptcy case was still active. *Id.*; *see generally* Dkt. Case No. 04-70916. Debtor further alleges that she received yet further communications from Mesquite Bean in August 2010, yet another default letter for Lot 27 covering the months of December 2009 through July 2010, and on October 11, 2010 she received a notice of foreclosure on Lot 27. [Case No. 10-10739, ECF No. 26 at ¶ 8-9]. Mesquite Bean filed its Response on April 21, 2011, which stated, *inter alia*, that Debtor's objection was improper, as it failed to object to the claim on any available basis under 11 U.S.C. § 502. [ECF No. 28].

On April 28, 2011 Debtor filed her Second Amended Plan which provisioned for payments for months 1-6 in the amount of $125 and months 7-60 in the amount of $450. [ECF No. 33]. Section 7 of the Plan provided for the Debtor to pay post-petition ad-valorem taxes on the two lots. Section 8 of the Plan provided for the payment of 2009 and 2010 ad valorem taxes on both Lots 26 and 27, $0 payment on Lot 26 and $10,659.64 on Lot 27 at 13% interest. Finally the Plan proposed a 100% dividend to the General Unsecured Class of Creditors.

On July 6, 2011, the parties entered into an Agreed Order resolving Debtor's Objection To Claim #5 which essentially allowed Mesquite Bean to file an additional Proof of Claim in the amount of $3,857.35 which represented the payment of ad valorem taxes by Mesquite Bean for Lot #26. [ECF No. 38]

On August 1, 2011, Debtor filed her third amended Plan. [ECF No. 45]. In Section 8 of the Plan, Mesquite Bean's claim (Claim #6) was scheduled as $3,857.35 on Lot 26 and $10,659.64 on Lot 27. *Id.* at 5. Both claims would receive 13% interest and be paid over the entire length of the 60-month Plan on a *pro rata* basis. *Id.* The total projected Trustee disbursements on account of Mesquite Bean's claims were $5,426.19 for Lot 26 and $14,994.96

for Lot 27.  *Id.* at 7.  Debtor was to pay $200 monthly from months 1-9 and $535 from months 10-60, for a net availability to creditors through the plan of $26,176.50.  *Id.*  Secured creditors, of which one was Mesquite Bean, were to receive $22,837.02.  *Id.* at 8.  Additionally, the Debtor proposed a 100% dividend to the General Unsecured Class of Creditors.  The Plan payments were to complete in October 2015.  *Id.* at 7.

On August 22, 2011, Mesquite Bean filed its Proof of Claim in the amount of $3,875.35, which represented ad valorem taxes paid by Mesquite Bean for tax years 2005-2009 on Lot 26. [Claim #6].

A confirmation hearing was held on October 6, 2011.  The Plan was confirmed as filed and subsequently amended.  [ECF No. 52].  The order confirming the Plan provisioned for Debtor to pay the trustee monthly in accordance with the terms of the Plan for no more than 60 months or until all filed and allowed claims were to be paid in full or as treated under the Plan. [ECF No. 52].  Mesquite Bean has neither objected to nor appealed from the order confirming the plan pursuant to the Plan's exact terms.

The chapter 13 proceeded, but the chapter 13 trustee ("***Trustee***") has had to file a Motion to Dismiss on multiple occasions.  [ECF Nos. 57, 61, 68, 79, 88, and 100].  Mesquite Bean has sought to intervene on several of these filings.  [ECF No. 89 and 101].

On October 6, 2015, the chapter 13 trustee filed a Notice of Final Cure and Motion to Deem Mortgage Current ("***Notice of Cure***"), wherein the Trustee asserted that Debtor had completed all payments due the Trustee under the confirmed plan.  [ECF No. 111].  Furthermore, the Trustee notified Mesquite Bean, pursuant to Fed. R. Bankr. P. 3002.1(f), that Debtor had paid in full the amount required to cure any default on all claims secured by the security interest in her

principal residence, to wit, Debtor's homestead. The Trustee stated that Mesquite Bean was owed a total of $13,682.38 on Lot 27 over the course of the plan, which had been paid in full according to her records. *Id.* at 2. The Trustee admits that the Notice of Cure only applied to Lot 27, which the Trustee conceded is not a 11 U.S.C. § 1322(b)(5) claim.[3] [ECF No. 127 at 7].

On October 26, 2015, Mesquite Bean filed an Amended Objection to the Trustee's Notice of Final Cure Payment and Motion to Deem Mortgage Current (the "***Objection to Notice***"). [ECF No. 113]. Mesquite Bean argued that the Notice was improper because Rule 3001.2(f) did not apply to its claim, as the claim is not provided for under § 1322(b)(5), but rather its claim was treated by the plan on a *pro-rata* basis. *Id.* at 1. Mesquite Bean admitted that it received the amounts that the Trustee alleged, but denied that those amounts are sufficient to satisfy its debt under the Plan. *Id.* Notwithstanding its Objection to Notice, and pursuant to Fed. R. Bankr. P. 3002.1, Mesquite Bean also filed a Notice of Post-Petition Mortgage Fees, Expenses & Charges ("***NPE***") in the amount of $4,385.52 and attached a summary of payments totaling $13,682.38. [Claim #7]; Creditor Ex. 5 at 1-2. Mesquite Bean stated that it filed the NPE without conceding that Rule 3002.1 applies to this case. By all accounts of the parties, Mesquite Bean had calculated an amount of $4,385.52 in principal and interest still due, on account of the fact that upon receipt of payments from the Trustee's office, Mesquite Bean applied the payments first to interest and post-petition ad valorem tax payments that Mesquite Bean had made on behalf of Debtor for Lot 27 then to the rest of the claim, thereby not reducing the principal and interest in accordance with the terms of the confirmed Plan. Mesquite Bean attached an exhibit, thereafter admitted into evidence as Creditor Exhibit 5, providing an

---

[3] In the Trustee's Brief, § 1322(b)(5) is mistakenly referred "§ 1325(b)(5)" – a section of the Code that does not exist. Any and all references to § 1322(b)(5) in relation to the Trustee's Brief in this Memorandum Opinion are references to "§ 1325(b)(5)" within the Brief.

accounting of taxes paid by Mesquite Bean on behalf of Debtor:

    a.  2011:
          i.  County - $167.32
         ii.  School - $261.28
    b.  2012:
          i.  County – $189.82
         ii.  School – $297.43
    c.  2013:
          i.  County – $189.29
         ii.  School – $297.43
    d.  2014:
          i.  County – $192.96
         ii.  School – $297.43
    e.  2015:
          i.  County – undetermined
         ii.  School – undetermined

    f.  Total Taxes: $1,892.96

The NPE determined that the final payment due to Mesquite Bean was $4,385.52 on account of unpaid principal and expenses, not including interest. Creditor Ex. 5 at 1. Notably, the Trustee commenced disbursing on Mesquite Bean's claim as early as March 24, 2011. From at least October 2010 through and including July 2012, (a total of $2,324.21) Mesquite Bean applied all of said payments to accrued interest and ad valorem taxes. *See* [ECF No. 127 at 8]. Mesquite Bean does not dispute that the Trustee has paid Mesquite Bean the amounts that she so claims, to which she believes the mortgage on Lot 27 has been satisfied in full.

This Court conducted an Evidentiary Hearing on December 2, 2015 (the "***Hearing***"). All exhibits offered by Mesquite Bean and the Trustee were admitted.

At the Hearing, it was revealed that the Trustee had already paid Mesquite Bean $1,902.53 towards Mesquite Bean's purported NPE amounting to $4,385.52. *See* Creditor Ex. 5. Mesquite Bean's own accounting of the balance due is at odds with the Trustee's accounting, the

Trustee having concluded that the final payment provisioned by the plan was made to the Trustee the month after completion of the plan. [ECF No. 127 at 6].

When pressed on these discrepancies at the Hearing, Mesquite Bean revealed that it had been collecting escrow for Lot 27 from the payments received from the chapter 13 trustee despite the fact that Mesquite Bean's claim was paid through the plan on a pro-rata basis, thus eliminating the escrow component of their claim (post-petition taxes should have been paid by the Debtor as reflected on Schedule J. [ECF No. 1]). Hence, every time a post-petition ad valorem tax payment was made on Debtor's behalf, Mesquite Bean added the payment to the total principal, upon which interest would begin to accrue. *See* [ECF No. 127 at 8].

When questioned by this Court, Mesquite Bean's representative could not coherently explain the basis of the NPE. Thus, this Court is left with making its own determination as to what comprises the NPE. Therefore, based on the documents filed along with the NPE, the evidence presented at the hearing and witness testimony, this Court has determined that the $4,385.52 claim is comprised of the unpaid principal balance of $4,202.56 from the original principal balance of the claim amount of $10,659.64 plus $182.96 in uncollected post-petition escrow.

It is the Trustee's understanding that Debtor does not argue with her obligation to reimburse Mesquite Bean for taxes actually paid on her behalf, but rather simply protests the manner in which the compounding interest has been calculated by Mesquite Bean. *Id.* Indeed, the Trustee adopts the same position, alleging that Mesquite Bean had been applying payments from the Trustee for monthly ad valorem tax escrow and accrued interest before applying the payments to the principal of the claim. *Id.* According to the Trustee, the result was that the

principal remained untouched under Mesquite Bean's records for the first twenty two (22) months of the Plan's administration. *Id.* This is supported by the NPE filed by Mesquite Bean and its attendant payment history attached thereto.

Following the Hearing, this Court directed that the parties brief this Court on any potential Rule 3002.1 issues. Three parties, to wit, Debtor, the Trustee, and Mesquite Bean, have submitted well-reasoned briefs on the relevant issues. [ECF Nos. 127, 128, and 130].

### III. Conclusions of Law

**a. Jurisdiction and Venue**

This Court holds jurisdiction pursuant to 28 U.S.C. § 1334, which provides that "the district courts shall have original and exclusive jurisdiction of all cases under title 11." 11 U.S.C. § 157 allows a district court to "refer" all bankruptcy and related cases to the bankruptcy court, wherein the latter court will appropriately preside over the matter. The Southern District of Texas's standing "Order of Reference to Bankruptcy Judges," provides for the automatic referral of bankruptcy cases to bankruptcy courts. *In re: Order of Reference to Bankruptcy Judges*, General Order 2012-6 (S.D. Tex. May 24, 2012). This is a core matter for the purpose of § 157, which provides that bankruptcy judges may issue final orders or judgments where the matter is determined to be core. Section 157 enumerates a non-exclusive list of core matters, which includes "matters concerning the administration of the estate." 28 U.S.C. § 157. The decision to dispose of a chapter 13 trustee's 3002.1(f) notice is squarely one that involves the administration of an estate and the interpretation of pure bankruptcy law. Moreover, there is a claim in this case that will necessarily have to be resolved by governing non-bankruptcy law, The Real Estate

Settlement Procedures Act[4] ("**RESPA**"). This furnishes the additional "arising under" jurisdiction that this Court needs to fully dispose of the entirety of this matter with finality. Therefore, jurisdiction is proper by the statutory provisions governing bankruptcy courts.

This Court may only hear a case in which venue is proper. Venue with respect to cases under title 11 is governed by 28 U.S.C. § 1408, which designates that venue may hold wherever "in which the domicile, residence, principal place of business in the United States, or principal assets in the United States, of the person or entity…" In her petition, Debtor designates her principal place of residence as San Benito, Texas. Therefore, venue is proper.

**b. Constitutional Authority To Enter A Final Order**

This Court also has an independent duty to evaluate whether it has the constitutional authority to sign a final order. *Stern v. Marshall*, 131 S. Ct. 2594 (2011). In *Stern v. Marshall*, the Supreme Court considered the constitutional limitations that Article III imposes upon § 157's grant of final order and judgment powers to non-Article III courts. *Id.* The Supreme Court held that § 157 violated Article III to the extent that it authorized final judgments on certain matters. *Id.* at 2616. The Court found that the particular bankruptcy ruling in dispute did not stem from bankruptcy itself, nor would it necessarily be resolved in the claims allowance process, and it only rested in a state law counterclaim by the estate. *Id.* at 2618. The Court reasoned that bankruptcy judges are not protected by the lifetime tenure attribute of Article III judges, but they were performing Article III judgments by judging on "all matters of fact and law" with finality. *Id.* at 2618-19. Hence, the Court held that Article III imposes some restrictions against a bankruptcy judge's power to rule with finality. The Court found that a solely state law based

---

[4] 12 U.S.C. §§ 2607-2617.

counterclaim, while statutorily within the bankruptcy judge's purview, escaped a bankruptcy court's constitutional power. *Id.* at 2620. This Court reads *Stern* to authorize final judgments only where the issue is rooted in a right created by federal bankruptcy or the resolution of which relies on the claims allowance process. In other words, this Court may issue final judgments and orders where the issue "arises in" or "arises under" bankruptcy, but not where the issue is merely "related to" bankruptcy. *See* 28 U.S.C. § 157. However, even where the case does create a "Stern problem," Article III will be satisfied where the parties to the case knowingly and voluntarily consent to the bankruptcy court's power to issue final judgments. *Wellness Int'l Network v. Sharif*, 135 S. Ct. 1932, 1938-39 (2015).

The decision to dispose of a chapter 13 trustee's 3002.1(f) notice is squarely one that involves the administration of an estate. This decision also involves issues regarding the claims allowance process. Therefore, this Court holds constitutional authority to determine the matter at bar.

### c. Analysis

Mesquite Bean's argument is, in essence, that this Court should strike the Trustee's Notice because Rule 3002.1 is not implicated in this case. This Court will consider the issues presented from that starting point.

### 1. The Applicability of Governing Rules and Procedures

The authority for courts to promulgate rules governing the conduct of their business and the procedures for matters on their docket has long been recognized. *See Miner v. Atlass*, 363 U.S. 641, 654 (1960). Currently, the power to make national rules of bankruptcy procedure is governed by 28 U.S.C. § 2075, which provisions that the Supreme Court may promulgate

"general rules, the forms of process, writs, pleadings, and motions, and the practice and procedure in cases under title 11," so long as they do not "abridge, enlarge, or modify any substantive right." Moreover, the Federal Rules of Bankruptcy Procedure themselves provision for the promulgation of local bankruptcy practice and procedure rules within a district's jurisdiction by a majority approval from its district judges.  Fed. R. Bankr. P. 9029(a).  In turn, the Bankruptcy Local Rules must be consistent with and not duplicative of the Bankruptcy National Rules and governing federal law.  *Id.*  Moreover, where there is no controlling law, an individual judge may regulate practice in any manner consistent with federal law, the national rules, the local rules, and the Official Forms.[5]  Fed. R. Bankr. P. 9029(b).

It is from this comprehensive fountainhead of powers to regulate procedure that this Court shall commence its analysis.

*The Southern District of Texas Bankruptcy Local Rules* ("**BLR**")

The relevant rules in place at the time of the petition were the BLRs effective December 1, 2009.[6] BLR 3015-1(b) is the first provision from the local rules that governs plans containing a treatment of home mortgages. Under this provision, "[h]ome mortgage payments will be made through the chapter 13 trustee, in accordance with Home Mortgage Payment Procedures." Furthermore, the local rule's provision enlists the chapter 13 trustee to develop the Home Mortgage Payment Procedures[7] ("**Trustee Procedures**," as amended "**Amended Trustee**

---

[5] The Notes of the Advisory Committee on the Rules noted as to the 1991 Amendment that the inclusion of the Official Forms language was to make it clear that those forms must be accepted in every bankruptcy court.

[6] *In re: Adoption of Amendments to Local Rules of Procedure*, General Order 2009-4 (S.D. Tex. Nov. 30, 2009), *available at* http://www.txs.uscourts.gov/file/764/download?token=iiwf24YC.  To the extent that this Memorandum Opinion makes references to the 2009 BLR, as relevantly amended, it is a reference to the provisions contained within General Order 2009-4.

[7] The governing Trustee Procedures, at the time in which the case was filed and the Plan was confirmed, were adopted on September 29, 2005 and amended on March 1, 2012 to the current version.  Chapter 13 Trustee Procedures for Administration of Home Mortgage Payments, U.S. Courts,

*Procedures*"), subject to approval by the Court. In turn, BLR 3021-1 directs that the chapter 13 trustee's disbursement of payments will follow certain criteria, the relevant portion of which is that "[p]ayments on claims that are for future mortgage payments shall be in the amount paid by the debtor with respect to the future mortgage payments. The debtor must make the payment in the amount required by the debtor's note and security agreement." Because the local rules reference the Trustee Procedures, this Court will now turn to any relevant provisions from those rules.

> ### The Trustee's Mortgage Payment Procedures

In the Trustee's Procedures, the debtor is to make payment to the chapter 13 trustee that includes an amount due on the debtor's mortgage installment for a claim secured by the debtor's principal residence pursuant to the terms of § 1322(b)(5) (hereafter more fully explained). Under paragraph 2 of the Trustee Procedures, the debtor is to make payments to the chapter 13 trustee upon dates that comply with the payment due dates in the underlying secured agreement. Furthermore, under paragraph 5, "No post-petition adjustment to the contractual installment payments due on a claim dealt with under § 1322(b)(5) shall be valid unless authorized by the agreement upon which the claim is based, and unless notice of the proposed adjustment is served on the debtor, debtor's attorney, and the chapter 13 trustee, not later than 45 days prior to the date the adjusted amount is due."  Trustee's Procedures at 2. However, under paragraph 7, any disbursements of the adjusted amount are subject to disgorgement or refund upon a ruling by the Court.  *Id.*  Furthermore, paragraph 10 provides that the chapter 13 trustee periodically file a report setting forth the date and amount of disbursements made to a creditor falling under this

---

http://www.txs.uscourts.gov/sites/txs/files/mort_proc.pdf, as amended by
http://www.txs.uscourts.gov/sites/txs/files/Ch13HomeMortgageProcedures.pdf.

provision. *Id.* If the creditor seeks to make an additional post-petition claim against the estate for items such as late fees or other charges authorized by the underlying agreement where such costs arose during the period covered by the chapter 13 trustee's report, such claim will be barred unless filed within 60 days of the report and allowed under the provisions of the plan.

> *This Court's Order Confirming the Plan*

This Court confirmed the Plan, which listed the remaining mortgaged debt on Lot 27 in the section for "All Other Secured Claims." [ECF No. 45 at ¶ 8]. Debtor did not place that debt under paragraph 4, which covers debts secured by an interest in the debtor's principal residence or other § 1322(b)(5) claims. Instead, the Plan provisioned that Lot 27 was to be paid pro-rata over the life of the Plan, accounting for $10,659.64 with an interest rate of 13%, and resulting in a "cure of all defaults (existing as of the date this plan is confirmed) of the debtor's obligations to the holder of the secured claim." *Id.*; *see also* § 1322(c)(2).

The primary distinction between § 1322(c)(2) and § 1322(b)(5) concerns the time in which the last payment under the original payment schedule is to be made. If the payment is to be made within the life of the bankruptcy, then the payment for the claim is governed by § 1322(c)(2). However, if that last payment should be made after the date on which the last plan payment is due then the payment of the claim is governed by § 1322(b)(5). Another distinction is that § 1322(b)(5) permits the debtor to cure a default in both secured and unsecured claims, while § 1322(c)(2) is limited to just a secured claim with a security interest in real property. In addition to the distinctions based on the timing of the final payment and the types of claims that each section covers, § 1322(c)(2) also provides that the payment of the claim may be modified as permitted by § 1325(a)(5). To wit, § 1325(a)(5) requires that the holder of a secured claim

accept the plan and that (1) the plan provide that the secured claimant retain the lien until the earlier of the debt has been paid, as determined by non-bankruptcy law, discharge, and should the case be dismissed or converted then claimant retains the lien as determined by non-bankruptcy law; (2) the value of the property, as of the effective date of the plan, is not less than the allowed amount of the claim; and (3) periodic payments be made and that such payments provide the claimant with adequate protection. § 1325(a)(5)(A-B).  Alternatively, the debtor may surrender the property to the claimant.  § 1325(a)(5)(C).

The Plan provided that Mesquite Bean would receive periodic payments for months 1 through 60 of the bankruptcy.  [ECF No. 45 at 5, 7]. Mesquite Bean received proper notice of the Plan, a fact that the party does not contest.  *Id.* at 9.  The provisions under the Trustee's summary were substantially the same.  [ECF No. 49].  This Court's order confirming the Plan ordered that:

- Debtor's Plan as proposed and set out in the Trustee's Report was confirmed;
- Debtor was to pay the chapter 13 trustee monthly according to the terms of the Plan for no more than 60 months or until all of the allowed claims had been paid in full under the terms as treated in the Plan;
- The order of payment was to go in order of trustee fees, ongoing regular monthly mortgage payments, Debtor's attorney's fees, and allowed claims.
- During the life of the Plan, Debtor was to timely pay all post-petition taxes.

[ECF No. 52].  The interwoven nature of the statutory and rules-based scheme requires that this Court conduct an analysis of the National Rules and the Code before deciding how any governing law or rules might apply to these issues.

## 2. Whether 3002.1 applies as a threshold matter

An analysis of the various issues presented shall begin with the text of the rule that Debtor and the Trustee claim supposedly governs.  Rule 3002.1 "applies only in chapter 13 cases and only to claims secured by a debtor's principal residence that are being cured and maintained

under the debtor's plan pursuant to § 1322(b)(5).  9 Alan N. Resnick & Henry Sommer, *Collier on Bankruptcy* ¶ 3002.1.01 (16th ed. 2015).  Rule 3002.1 provisions that a creditor who holds such a claim file notice of any change in the payment amount that results from an interest rate or escrow account adjustment no later than 21 days before a payment in the new amount is due. Fed. R. Bankr. P. 3002.1(b).  Rule 3002.1 also provisions that the holder of a claim shall file a detailed notice itemizing all fees, expenses, or charges incurred in connection with the claim and that is asserted to be recoverable against the debtor or the debtor's principal residence.   Fed. R. Bankr. P. 3002.1(c).  When the chapter 13 debtor has completed all payments under the plan, the trustee shall file a notice within 30 days, stating that the debtor has "paid in full the amount required to cure any default on the claim." Fed. R. Bankr. P. 3002.1(f).  The holder of the claim is obligated to respond to the 3002.1(f) notice within 21 days of its issuance, indicating whether the holder agrees that the debtor has fully cured its default and whether the debtor is otherwise current on all payments pursuant to § 1322(b)(5). Fed. R. Bankr. P. 3002.1(g).  Moreover, in its response, the holder of the claim shall itemize any required cure or post-petition amounts that the holder believes remain unpaid.  *Id.*

To fully understand the meaning of Rule 3002.1, this Court must also prevail upon the text of § 1322(b)(5), which provisions that a chapter 13 plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." In other words, 3002.1 notice by the creditor is required where the security interest is the debtor's principal residence and the underlying loan documents provision for the continued payment on the debt beyond the statutory limits of the confirmed

chapter 13 plan.  *In re Pierrotti*, 645 F.3d 277, 281 (5th Cir. 2011).

An analysis of the effect of rule 3002.1 on these issues is also affected by the timeframes in this case. As Mesquite Bean points out, Rule 3002.1 became effective on December 1, 2011, which is after this Court's October 6, 2011 order confirming the Plan. Mesquite Bean argues, *inter alia*, that an application of Rule 3002.1 to its mortgaged debt would constitute ex post facto application of law, which is presumptively disallowed.  [ECF No. 130]; *see Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994).  However, this Court believes that Mesquite Bean's argument misses the mark, for this Court must parse the difference between the pre and post-Rule 3002.1 dates. In other words, where Rule 3002.1 is missing, non-bankruptcy law applies to noticing requirements. Our sister bankruptcy court has had the occasion to review this issue on all four corners in a case where the debtor's plan was executed before and after Rule 3002.1 came into effect.  *In re Garza*, Case No. 08-60088, 2012 WL 4738651, at *1 (Bankr. S.D. Tex. Oct. 1, 2012).  There, the court concluded that the failure of the creditor to properly notice during the Rule 3002.1 years constituted a violation of the rule, while the failure to properly notice during the pre-rule days constituted a violation of the RESPA.  *Id.*at *3.  In analyzing RESPA, the court concluded that a mortgage lender is required to provide an annual statement of the borrower's escrow account prior to January 31 of each year.  *Id.* at *3  In order to conclude that no notice was sent, the court looked to the record and determined that neither the debtor nor the trustee had taken any action for four years or filed any documents with the court regarding a change.  *Id.*  The court concluded that this made the notion that the bank had not sent any RESPA deficiency notice a certainty and, as such, the penalty was to deem the bank to have waived any deficiencies for the ad valorem taxes paid on the debtor's behalf.  *Id.*

The matter at bar raises the exact same issue, and this Court is inclined to agree with its learned sister court[8] and disinclined to defile Debtor's fresh start with a surprise attack at the conclusion of the case.  This Court need not opine on the discrete issue of whether Rule 3002.1 retroactively applies, as this Court will hereafter conclude that the rule is entirely inapplicable to the instant case, because Mesquite Bean's claim was provided for under §1322 (c)(2) and not 1322(b)(5), as required by Rule 3002.1(a).

The issue of whether Rule 3002.1 properly governs Mesquite Bean's attempt to change the debt and payment amounts is easily disposed. The Trustee's Notice of final cure references only "Lot 27" as having been paid in full under the plan.  [ECF Nos. 111 and 127].  Mesquite Bean explicitly shows through its schedule of payments over post-petition dates that it had been paid $13,682.38, the equivalent of the Trustee's claimed disbursements to Mesquite Bean. This is exactly the number calculable to have paid off Lot 27 for interest and principal since the plan was confirmed and the compound interest of 13% began accruing onto the principal of $10,659.64.

A reading of the briefs supporting the instant matter reveal some disagreement as to whether Lot 27 qualifies as a principal place of residence as defined under Rule 3002.1.  [ECF No. 127 at 1 n.1] (stating that"[d]uring the course of trial it was stated that Lot 27 was not used as a principal residence but was in fact an empty lot."); [ECF No. 128, at 4] (stating that "[t]he Debtor duly listed lots 26 and 27 as her homestead as they are adjacent lots and no objections were filed to the claimed exemptions."); [ECF No. 130, at 3] (stating that "[i]n this case, the testimony was that the lot in issue is a vacant lot and so is not the debtor's principal residence").

---

[8] *Comity*, "A practice among political entities (as countries, states, or courts of different jurisdictions), involving esp. mutual recognition of legislative, executive, and judicial acts."  *Black's Law Dictionary* (10th ed. 2014).

Again, this Court declines to let the applicability of Rule 3002.1 rise or fall upon whether Lot 27 is a Debtor's principal residence, for the answer rests on more confident bedrock.

Rule 3002.1 is swiftly dismissed on narrower grounds. Under § 1322(b)(5), the plan may provision for the curing of defaults and maintenance of payments on any claim *on which the last payment contemplated in the underlying agreement is due after the date on which the final payment under the plan is due*. This is not the case here. *See In re Pierrotti*, 645 F.3d at 281 ("we interpret § 1322(b)(5) to apply only to a debt whose pre-bankruptcy terms establish that the final payment is not due until after the end of a Chapter 13 plan's maximum term").

Rather, a careful calculation from the underlying Note shows that regular payments would have fully paid off the debt in November 2015. *See* Creditor Ex. 1 at 15. The order confirming the Plan provisioned for Debtor to make regular payments under the plan for 60 months from the time of confirmation on October 6, 2011, after which the principal claim at the time would have been deemed entirely paid off. [ECF No. 52]. That would make final payments under the plan come due in October 2016. Therefore, the underlying claim did not contemplate the existence of the debt beyond the date in which final payments were to be made under the plan.

The Trustee concedes that the facts of the instant case "fall short" of the literal criteria of Rule 3002.1 and § 1322(b)(5). [ECF No. 127 at 7]. Nevertheless, the Trustee points to a trifecta of cases from outside jurisdictions where bankruptcy courts have found the applicability of Rule 3002.1 "in other circumstances when the facts don't seem to quite fit the plain meaning of the rule." *Id*. This Court agrees with the Trustee that the facts here are inapposite to the plain meaning of Rule 3002.1. Rule 3002.1 applies in cases where the security interest is the debtor's

principal residence *and* for which payments are provided under § 1322(b)(5). This Court shall decline the Trustee's invitation to disinter Rule 3002.1 and § 1322(b)(5) from the hornbooks by tortuously inserting new language therein. Where the language of a statute or rule is unambiguous, the analysis generally begins and ends with its plain meaning. *See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571 (1982) (cited by *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 242 (1989) ("The plain meaning of legislation should be conclusive, except in the rare cases in which the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters." (internal quotation marks omitted)); *In re Guerrero*, 540 B.R. 270, 282 (Bankr. S.D. Tex. 2015). Suffice it to say that this Court is not impelled to, in essence, to do the work of filling in the blanks for Congress as though it were playing a game of judicial Mad Libs.[9] *See Yates v. United States*, 135 S. Ct. 1074, 1099 (2015) (Kagan, J., dissenting) ("But § 1519's meaning should not hinge on the odd game of Mad Libs the concurrence proposes. No one reading § 1519 needs to fill in a blank after the words "records" and "documents.""); *see also* Saikrishna B. Prakash, *The Sweeping Domestic War Powers of Congress*, 113 Mich. L. Rev. 1337, 1384 (2015) ("assume that the Constitution has an implied principle requiring some separation of powers across the three branches. That is to say, what the Constitution vests in separate hands (legislative, executive, and judicial power) generally must stay separated, meaning that no one federal institution may exercise two or more powers").

Albeit, this Court could possibly reason that the use of "and" in Rule 3002.1(a) actually creates a disjunctive test, where either element would fulfill the test. This theoretical argument is

---

[9] A game with the basic outline of a story, but which allows the participant to fill in the blank spaces with nouns, verbs, and adjectives, leading to an absurd story.

also too much for this Court to bear. To read such a disjunctive test would put Rule 3002.1 at startling odds against the language of § 1322(b)(5). Under § 1322(b)(5), the plan may "provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due." A careful reading of this provision clearly shows three elements: provide for curing and maintenance of payments; on any unsecured or secured claim; on which the last [agreement] payment is due after the date of final payment is due. The key to understanding that this is a conjunctive test is the language "on which," which contains no reservations. Why then, when § 1322(b)(5) employs a conjunctive test, would a rule designed to facilitate better implementation of the statute (according to the Committee on the Rules) have a disjunctive test? Such a reading in *pari materia* would get the comprehensive scheme backwards.

This Court can certainly envision some scenarios where Rule 3002.1 turns a blind eye to the injustices befalling chapter 13 debtors that get a surprise ending to their plan. There is something fundamentally wrong about a mortgagee not warning a debtor ahead of time exactly how their fees and expenses for ad valorem taxes have accrued over the course of five years or how payment changes might be implicated, because the trustee or debtor would want the opportunity to review any relevant information and possibly dispute the charge in a timely fashion. That is a scenario predicted by the wisdom of Rule 3002.1. However, there are key differences. A proper § 1322(b)(5) treatment essentially involves getting the debtor timely up to speed on any arrearages and then maintaining regular payments so that the debtor will be fully current by the time the chapter 13 plan is over. The logic is that the debtor, now free of pre-

petition debts, will be capable of coping with the mortgage payments after discharge, rather than slipping back into bankruptcy once more. Moreover, it is not up to a court to override the plain meaning of legislation absent compelling circumstances, such as where the plain reading will render outcomes that are shocking or bizarre. *Guerrero*, 540 B.R. at 282 (referencing the doctrine of absurd consequences). This Court has already had the occasion to conclude that Congress is free to choose methods overbroad to its underlying intention. *Id.* This Court now also concludes that Congress is free to choose under broad methods as well, especially in light of the potential rationale for doing so, which includes an abundantly cautious avoidance of making an overbroad effect or a superfluous outcome that is addressed in other legislation. That is just the case here, because RESPA answers where Rule 3002.1 remains silent. This Court is hardly perplexed or shocked by the consequences here.

The analysis does not end there, of course. This Court must also do honor to the local rules governing home mortgages. BLR 3015-1(b) provisions that home mortgage payments will be made through the chapter 13 trustee and directs the trustee to draft up a set of home mortgage payment procedures. In turn, the Trustee's procedures provide that no "post petition (sic) adjustment to the contractual installment payments due on a claim dealt with pursuant to § 1322(b)(5) shall be valid unless authorized by the agreement… and unless notice of the proposed adjustment is filed not later than 45 days prior to the date the adjusted amount is due." The logic behind this provision is that there should be no surprises come time for the last plan payment. Here, there is just such a surprise. However, the home mortgage debt held by Mesquite Bean had no life outside of the Plan, and § 1322(b) is therefore inapplicable. Therefore, this Court holds that the Trustee's notice requirement is inapplicable because it only applies to claims "dealt with

pursuant to § 1322(b)(5)," which is not implicated by the claims involved in the instant case.

Mesquite Bean rightly points out that Rule 3002.1 and § 1322(b)(5) are inapplicable because the debt on Lot 27 was provisioned to be paid *pro-rata* at 13% interest, wherein the Plan provided that "[p]ayment of the amounts required in this section constitutes a cure of all defaults (existing as of the date this plan is confirmed)." [ECF No. 45 at 5]. This is also the reason why Mesquite Bean's argument that it has not been fully satisfied under the Plan and its accounting for the shortfall fails. Mesquite Bean was to be paid under the terms of the Plan, not by its own terms. Mesquite Bean, by its own admission, applied the disbursements from the Trustee to Mesquite Bean onto its accounting of ad valorem taxes it had paid on behalf of Debtor for Lot 27 before applying the remainder to any other items. This procedure fails under the terms of the Plan and the order confirming it. The order confirming the plan set out a scheme for how payments would be applied in no uncertain terms: the Trustee's fee; ongoing regular monthly mortgage payments; Debtor's unpaid attorney's fees; and allowed claims. [ECF No. 52]; *see also* 11 U.S.C. §§ 1322(b)(2) and 1327(a); *In re Stratford of Tex., Inc.*, 635 F.2d 365, 368 (5th Cir. 1981); *In re Padilla*, 379 B.R. 643, 662-64 (Bankr. S.D. Tex. 2007) (applying the provisions of § 1327 apply to creditors that hold mortgages on property owned by chapter 13 debtors). Neither the order nor the Plan contemplate that payments under the plan may cover extraordinary and unexpected tax escrow adjustments. Rather, the order simply directed that Debtor timely pay all post-petition taxes, thereby placing the payment of taxes outside of the ambit of regular payments under the plan and into the ambit of extraordinary, post-petition administrative expenses when a failure of Debtor to pay ad valorem taxes, as was Debtor's duty, occurred and Mesquite Bean exercised its right under the Note to pay ad valorem taxes on behalf of Debtor

and seek reimbursement.  *Id.*   However, by applying the Trustee's Plan payments to tax escrow, Mesquite Bean violated the Plan in an ongoing basis by circumventing the order confirming the Plan, which provisioned a very clear ordered scheme for how Trustee payments were to apply - and which did not provision for the application of said payments to post-petition administrative expenses, including taxes paid on behalf of Debtor. It is canon law that an order confirming a plan produces a *res judicata* effect as to its terms, absent timely objection or appeal.  *United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 262 (2010).  This Court therefore rejects Mesquite Bean's accounting of the remaining deficiency under principles of *res judicata*. Essentially, this means that full payments have been made under the Plan on account of Lot 27, to which the plan has thereby fully cured the $10,659.64 of principal debt and the interest compounded thereon.

Rule 2016 is implicated because the ad valorem tax payments on behalf of Debtor are an administrative, necessary post-petition expense. The rule provides that "*an entity seeking* interim or final compensation for services, or *reimbursement of necessary expenses*, from the estate shall file an application setting forth a detailed statement…"  Fed. R. Bankr. P. 2016(a) (emphasis added). This statement is to include

> (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested. An application for compensation shall include a statement as to what payments have theretofore been made or promised to the applicant for services rendered or to be rendered in any capacity whatsoever in connection with the case, the source of the compensation so paid or promised, whether any compensation previously received has been shared and whether an agreement or understanding exists between the applicant and any other entity for the sharing of compensation received or to be received for services rendered in or in connection with the case, and the particulars of any sharing of compensation or agreement or understanding therefor, except that details of any agreement by the applicant for the sharing of compensation…

Fed. R. Bankr. P. 2016(a).  Rule 2016(a) contemplates that an application under the rule may be filed by not only an attorney involved in the case, but also by creditors.  *Id.* ("The requirements of this subdivision shall apply to an application for compensation for services rendered by an attorney or accountant even though the application is *filed by a creditor* or other entity.") (emphasis added).  Furthermore, the Code also provides that "an entity may timely file a request for payment of an administrative expense, or may tardily file such request if permitted by the court for cause."  11 U.S.C. § 503(b)(1).  Moreover, "actual, necessary costs and expenses of preserving the estate" and "any tax… incurred by the estate, whether secured or unsecured, including property taxes for which liability is in rem, in personam, or both, except a tax of a kind specified in section 507(a)(8) of this title…"  *Id.*  Section 503 administrative expenses do not apply to § 507(a)(8) taxes, none of which are relevant here, as a post-petition tax liability is appropriately understood to be a § 503(a) administrative expense.  § 503(b)(1)(B)(i); *see also In re Stillwater*, 443 B.R. 714, 717 (Bankr. W.D. Va. 2011).   In addition to the provisions for expenses in § 503, the Code also provides that the holder of a secured claim, which is less than the value of the property upon which it is secured by, then "there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement or State statute under which such claim arose."  11 U.S.C. § 506(b); *In re Padilla*, 379 B.R. at 654, 656 (discussing the application of § 506(b) to oversecured creditors until confirmation); *see also Rake v. Wade*, 508 U.S. 464, 468 (1993) (stating that "506(b) applies only from the date of filing through confirmation date").

The purpose of the Rule 2016 requirement is to permit courts to "maximize equality among creditors… [by] closely scrutiniz[ing] oversecured creditors' requests for post-petition

fees, expenses and interest." *In re Padilla*, 379 B.R. at 654 (citing to *In re Tate*, 253 B.R. 653, 668 n.8 (Bankr. W.D.N.C. 2000)). The key to understanding § 503's application here is whether Mesquite Bean filed for reimbursement of post-petition ad valorem taxes as an administrative expense in a *timely* manner each time such expense was borne, such as to furnish appropriate notice to all parties that it sought extraordinary reimbursement from the estate. Mesquite Bean should have filed an application or claim for administrative expenses after each and every such payment, rather than effectively operating as a shadow brokerage with shadow accounting methods. The NPE, filed as Claim # 7 on October 26, 2015, woefully fails to comply with any reasonable conception of timely filing an administrative claim. Moreover, seeking to recover the administrative expenses through the accounting practices employed by Mesquite Bean is, in reality, a violation of the order confirming the plan. To wit, Mesquite Bean failed to follow the appropriate process by filing an application pursuant to Rule 2016(a) and receiving permission from this Court to apply the payments received from the Trustee against the "accruing" post-confirmation administrative expenses. *In re Padilla*, 379 B.R. at 657-62 (discussing how Rule 2016(a) and § 1322 work together and creditors are required to file applications for post-petition expenses).

Assuming arguendo, that the NPE was applicable in this case, such Notice wholly fails to disclose when those post-petition administrative expenses were incurred, e.g. whether such expenses were incurred within the last 180 days of the filing of the 3002.1(c) Notice or later. Moreover, the NPE is not a substitute for filing an Rule 2016 application. Therefore the filing of the NPE is a dead letter. Therefore, under the dictates of § 503 and Rule 2016(a), Mesquite Bean is barred from claiming administrative expenses.

This Court also sees no evidence offered by Mesquite Bean that its failure to timely file a claim is attributable to excusable neglect, such that would invite this Court to find the cause necessary to permit a tardy filing with respect to the balance of its claim. Rather, this Court concludes that a sophisticated lender like Mesquite Bean knew or should have known better. This court finds that Mesquite Bean has, at a minimum, failed to comply with Fed. R. Bankr. P. 2016(a).

### 3. Notice Requirements from Nonbankruptcy Law

This Court will now also consider nonbankruptcy law in determining whether Mesquite Bean is entitled to reimbursement for payment of post-petition ad valorem taxes already paid on the property. There is one relevant provision that will affect the validity of Debtor's post-petition related expenses as to the debt secured by Lot 27.

RESPA contemplates, *inter alia*, terms for the proper administration of escrow accounts held by federally related mortgage servicers. In turn, federal regulations promulgate noticing requirements. 24 CFR 3500.17 commands that a mortgage servicer draft an escrow account analysis that determines appropriate target balances, computes the borrower's monthly payments for the next escrow computation year and any deposits needed to establish or maintain the account, and determine whether shortages, surpluses, or deficiencies exist.  24 CFR 3500.17(b). Moreover, this report shall be sent to the debtor no more than 30 days following the last day of the computation year. The computation year is the 12 months following the borrower's initial payment date. Finally, the servicer shall submit an annual escrow account statement to the borrower within 30 calendar days of the end of the computation year.  *Id.*

Finding serial RESPA violations here is an easy task. Regular payments under the

original note were to commence on the 22nd day of every calendar month starting December 22, 2000 and ending whenever the principal was completely paid off. Each payment would be credited *first* to escrow fees, then late fees, services, interest, and principal. There is no evidence in the record that an escrow account notice, which would have become due in January of every year, was ever submitted to Debtor when Mesquite Bean paid post-petition ad valorem taxes on Debtor's behalf for Lot 27. Nor does Mesquite Bean even attempt to make such claim. Instead, Mesquite Bean offers no controversion against the Trustee's argument that regularly required notices of post-petition charges for ad valorem taxes, effectively charged as first in right against the Trustee's payments, have not been issued by Mesquite Bean. [ECF No. 127 at 6] ("Because the mortgage loan in this case continued to accrue charges monthly for [ad valorem] tax escrow[, albeit outside of the plan,] it could not be paid in full [within] the plan[, as contemplated by Mesquite Bean,] by either the Trustee or the Debtor without regular notices of post-petition charges from the Mortgagee. This is precisely the scenario Rule 3002.1 was intended to address"). This Court, taking the weight of the arguments and evidence, or lack thereof, concludes that no required escrow account, which would give the parties the required notice of post-petition tax related obligations, has ever been furnished by Mesquite Bean on January of every applicable post-petition year.

As such, this Court joins our esteemed sister court in finding overt violations for the years 2011-2014 in which Mesquite Bean failed to submit a detailed accounting of escrow, but for which it still believes it is entitled to non-ordinary reimbursement. *See In re Garza*, 2012 WL 4738651, at *5. This Court will now decide on an appropriate remedy.

#### 4. Remedy for the Foregoing Violations

According to *In re Garza*, the majority of courts have determined that the proper remedy for a failure to abide by the required notice of escrow account analysis under RESPA is essentially a death knell: deeming a waiver of any right to recover any deficiencies encompassed by the failed period.  2012 WL 4738651, at *5; *see e.g.*, *In re Johnson*, 384 B.R. 763 (Bankr. E.D. Mich. 2008); *In re Dominque*, 368 B.R. 913 (Bankr. S.D. Fla. 2007). This Court agrees and joins  these other courts in finding that the appropriate remedy is this effective denial. Since the deeming of a waiver is not specifically provisioned for in the regulations, this Court will also consider equitable factors in the contemplated remedy. As such, this Court will consider factors such as willfulness, prejudice, and a pattern of activity.   *See* Fed. R. Civ. P. 11 advisory committee's notes to 1993 amendment (outlining a non-exhaustive list of factors for issuing appropriate level of sanctions).

There is no express indication that Mesquite Bean violated RESPA and Texas law on purpose. However, Mesquite Bean engages in the business of real estate lending, and a basic reading of the mortgage documents, accounting documents and related live testimony of the Scott R. Campbell of SRC Management at the hearing, reveals hardly an unsophisticated operation. Rather, Mesquite Bean appears to be a perfectly competent mortgagee. This Court feels implored to conclude that Mesquite Bean was at least highly negligent in not abiding by the notice provisions it should have known apply. Finally, Debtor has been forced to appear for a hearing and faces the prospect of a $4,385 bill where she believed she had walked the path of chapter 13 relief, albeit on a rocky road.

If there were ever a case to employ the usual method of waiving a creditor's claim to an

unnoticed post-petition claim, this would be that case. For the foregoing reasons, Mesquite Bean is deemed to have waived any right to recover any post-petition claim for uncollected taxes, accrued interest or the like. Moreover, in light of the amount that the Trustee turned over to Mesquite Bean on account of the Notice of Fees, this Court finds that disgorgement back to the Trustee is the appropriate remedy. The Trustee shall dispose of the remaining funds in accordance with 11 U.S.C. §1306.

To reiterate, the debt on Lots 26 and 27 have been fully cured and paid off. Mesquite Bean shall comply with any procedure necessary to release its lien on Lots 26 and 27.

## V. Conclusion

To honor the promise and spirit of chapter 13 administrations for the compliant debtor, this Court has determined that the remedy for a mortgage creditor's failure to provide appropriate notice is disallowance of the implicated deficiencies. Notice is vital to an effective rehabilitation, because it offers the opportunity to object and have a day in court, which ultimately allows a case to continue moving forward without ending in a surprise at the end of the case. It is from the twin pillars of a fresh start and the orderly administration of the estate to *all* creditors' benefit that the applicable notice requirements hang. Moreover, notice cannot function without a reasonable expectation that the rules will be followed by all. A mortgagee cannot spring upon the debtor a reticent debt that lingers like a haunting refrain.

It is **ORDERED** that:

1. The debt secured by Lots 26 and 27 are fully cured and paid off as of the date of final plan payment. Mesquite Bean shall adjust its books and records in accordance with this Court's Order and release its liens on those lots within 14 days of the entry of the

accompanying order.

2.  The Trustee's 3002.1 Notice of Cure, [ECF No. 111], is hereby **STRICKEN**.

3.  Objection to Claim 7, [ECF No. 129], is hereby **SUSTAINED**.

4.  Claim # 7 is hereby **DISALLOWED**, being substantially related to the foregoing issues.

5.  The amount of $1,902.53 paid by Trustee on Mesquite Bean's NPE is hereby disgorged and shall be returned to the Trustee.

6.  Trustee shall prepare and file her Final Report and Account as soon as reasonably possible.

SIGNED 03/11/2016.

Eduardo V. Rodriguez
United States Bankruptcy Judge